UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JULIANA EE,

                Plaintiff,                              Civil No. 07-1728-HA

                v.                              OPINION AND ORDER

WASHINGTON COUNTY, BENTON
COUNTY, LINN COUNTY, political
subdivisions of the State of Oregon,
OREGON CASCADES WEST COUNCIL
OF GOVERNMENTS, an intergovernmental
agency operating in the State of Oregon, and
DOUGLAS MacELLVEN, KATIE
HARRIS, DON JOHNSON, and KIM
GROOMS, in their individual and official
capacities,

                Defendants.

_____

HAGGERTY, District Judge:

      Plaintiff Juliana Ee brings a Complaint against defendants asserting claims under 42 U.S.C.

§§ 1981, 1983, and 1985, and state law claims of intentional interference with business relations,

and defamation.  Defendants Washington County, Columbia County, Douglas MacEllven, and Katie

Harris filed a Motion for Summary Judgment [86] and oral argument was heard on February 11,

2010.  For the following reasons, defendants' Motion is granted in part and denied in part.

**FACTUAL BACKGROUND**

1 - OPINION AND ORDER

Nearly all facts in this case are disputed. The following factual summary is stated in a light favorable to plaintiff, the non-moving party, and does not necessarily reflect the facts likely to be proved at trial. Additional facts will be addressed as necessary in analyzing defendants' Motion.

Plaintiff is Chinese but has been speaking English for forty-five years and is fluent. Pl.'s Concise Statement of Material Facts (Pl.'s Facts) ¶ 3. In 2001, plaintiff, a psychologist, contracted with the Portland Veterans Administration Medical Center (PVAMC) to perform compensation and pension (C&P) examinations of veterans with psychiatric disorders including Post Traumatic Stress Disorder (PTSD). Defs.' Concise Statement of Material Facts (Defs.' Facts) ¶ 11. As a C&P examiner, plaintiff's job was to review medical records, interview veterans, diagnose mental health issues, and determine if any diagnosed conditions were linked to service-connected incidents. *Id*. ¶ 12; Pl.'s Facts ¶ 3.

Defendants Douglass MacEllven (MacEllven) and Katie Harris (Harris) were employed by defendant Washington County during all relevant time periods as county veterans service officers (CVSOs). Defs.' Facts ¶ 1. County veterans service officers assist veterans in obtaining benefits from the VA and their goal is to maximize the benefits received by the veterans they assist. *Id*. Defendant Columbia County contracted with Washington County to provide VSO services for Columbia County veterans. *Id*. ¶ 6.          Plaintiff had a year-to-year contract with the PVAMC, which expired automatically unless renewed by the mutual assent of the PVAMC and plaintiff. *Id*. ¶ 11. Plaintiff's contract was renewed annually until 2007, when the PVAMC decided not to renew her contract. *Id*. ¶ 31. Plaintiff alleges that the PVAMC's refusal to renew her contract was induced by actions taken by defendants against plaintiff as a result of her Asian ancestry and gender. Defendants respond that the PVAMC decided not to renew plaintiff's contract based on complaints from disparate sources "concerning plaintiff's interpersonal interactions with veterans during C&P exams." *Id*.

There is no official VA policy regarding Asian theater veterans and their potential prejudices against Asian individuals, although the VA provides training regarding this issue and condones noting a veteran's preference not to be examined by an Asian doctor.  Pl.'s Facts ¶ 19; Defs.' Facts ¶ 4.  It was a Washington County practice to discuss potential bias with veterans before a C&P examination with plaintiff.  Pl.'s Facts ¶ 19.

In May 2004, MacEllven believed that plaintiff made an obvious error in one of her reports and that she intentionally selected negative information regarding a veteran's stressor.  *Id*. ¶ 23.  Don Johnson, a CVSO from the Oregon Cascades West Council of Governments, also began complaining about plaintiff and referred to her as "that Oriental lady."  *Id.* ¶ 24.  A number of other VSOs also made complaints.  *Id.*

On July 26, 2005, Johnson sent an email to all CVSOs in his directory alleging that plaintiff had "fabricated evidence" and sabotaged veterans' claims.  *Id.* ¶ 23.  MacEllven and Johnson discussed collecting complaints about plaintiff in an effort to have her fired, and MacEllven asked veterans to record their impressions of plaintiff immediately following examinations.  *Id.* ¶ 26-27.  Plaintiff alleges that Washington County managers, including MacEllven, tolerated racist and sexist behavior from both veterans and VSOs.  *Id.* ¶ 25.  James Palmer, a Vietnam veteran and a Washington County VSO, referred to Asians as "gooks" but was never reprimanded.

In November 2005, MacEllven wrote a letter to Dr. Jim Tuchschmidt, head of the PVAMC, discussing the alleged problems he and other VSOs had with plaintiff.  *Id.* ¶ 28.  MacEllven included a letter Harris had written to Senator Gordon Smith.  *Id.*  Harris had written the letter at MacEllven's direction after Senator Smith's office contacted MacEllven regarding complaints the Senator had received concerning plaintiff.  In the letter, Harris stated that "[i]n my opinion and what I have heard some of my clients say it is a slap in the face to have a woman with no military or combat experience of Asian descent conduct interviews for PTSD," and that "I currently advise my clients to request a

man for their PTSD examinations." Ostar Decl. Ex. 10.  Although the letter was never sent to

Senator Smith, it was sent to Dr. Tuchschmidt as an attachment to a letter MacEllven had written.

Many of the initial complaints from VSOs pertained to plaintiff's ethnicity and caused Dr.

Tuchschmidt to question their validity.  Pl.'s Facts ¶ 32.  Doctor Tuchschmidt ordered an

independent audit of plaintiff's C&P reports.  *Id*.  The audit revealed that plaintiff's examinations

were accurate.  *Id*.  Thereafter, VSOs complained about the manner in which plaintiff conducted her

examinations.  *Id*.

Veterans service officers continued to make complaints regarding plaintiff's examinations

and encouraged veterans to request that they not be scheduled with an Asian doctor or with a female

doctor.  *Id*. ¶ 17, 37.  In 2007, the PVAMC decided not to renew plaintiff's contract.  Plaintiff was

the only contract C&P examiner whose contract was not renewed in 2007.  *Id*. ¶ 40.

## STANDARDS

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no

genuine issue as to any material fact."  Fed. R. Civ. P. 56(c); *see Bahn v. NME Hosps., Inc.*, 929

F.2d 1404, 1409 (9th Cir. 1991).  The moving party carries the initial burden of proof and meets this

burden by identifying portions of the record on file that demonstrate the absence of any genuine

issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the initial

burden is satisfied, the burden shifts to the non-moving party to demonstrate through the production

of probative evidence that there remains an issue of fact to be tried.  *Id*.

The court must view the evidence in the light most favorable to the non-moving party.

*Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000) (citations omitted).  All

reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving

party.  *MetroPCS, Inc. v. City & County of S.F.*, 400 F.3d 715, 720 (9th Cir. 2005) (citation

omitted).  Where different ultimate inferences may be drawn, summary judgment is inappropriate.  *Sankovich v. Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981) (citing Fed. R. Civ. P. 56(c)).

Deference to the non-moving party has limits.  The non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The "mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).  Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).

## DISCUSSION

Plaintiff brings federal claims pursuant to 42 U.S.C. §§ 1981, 1983, and 1985 alleging that Washington County VSOs, in concert with other VSOs, unlawfully sought to have plaintiff removed as a C&P examiner because plaintiff is an Asian female, in violation of the Fourteenth Amendment to the United States Constitution.  Plaintiff also brings state law claims of defamation and intentional interference with a contract.  Defendants Washington County, Columbia County, Douglas MacEllven, and Katie Harris move for summary judgment on all claims.  This court granted defendants' Motion to Substitute Defendant [92] pursuant to Or. Rev. Stat. 30.265(1), and defendant Washington County was substituted for individual defendants MacEllven and Harris on all state law claims.

### Columbia County

Defendants contend that Columbia County should be dismissed from this action because Columbia County merely contracted with Washington County to furnish VSO services.  Columbia County did not exercise control over the provision of those services and did not employ either

MacEllven or Harris.  Although Harris acted as the Columbia County CVSO, she was hired, trained, and supervised by Washington County.  Because Columbia County did not exercise any control over Harris, and did not establish any policies or procedures for the provision of veterans' services, Columbia County is dismissed from this action.

**Section 1983 Claim**

Section 1983 creates liability for a person acting under color of law who deprives another of a right guaranteed by the Constitution or federal law.  *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).  To prove her case under § 1983, plaintiff must prove that (1) defendants acted "under color of state law," and (2) defendants deprived her of a federal right.  *Id.* (quoting *Parratt v. Williams*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)).  Plaintiff alleges the deprivation of her right to equal protection in violation of the Fourteenth Amendment because defendants intentionally discriminated against her on the basis of her race and/or gender.

To establish a *prima facie* case of intentional discrimination under § 1983, plaintiff need not satisfy any particular test, but must simply "produce evidence sufficient to establish a genuine issue of fact as to the defendant's motivations" for the allegedly discriminatory actions taken.  *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991).  "Discriminatory intent may be proved by direct or indirect evidence."  *Id.*

If plaintiff makes a *prima facie* case, the burden of production shifts to defendants to articulate some legitimate, non-discriminatory reason for the adverse actions.  *Rodriguez v. General Motors Corp.*, 904 F.2d 531, 533 (9th Cir. 1990).  If defendants meet this burden of production, plaintiff must "show that the articulated, legitimate reason was, in fact, pretextual."  *Id.*  Where the

articulated legitimate reasons are credibly challenged as pretextual, the judgment of credibility must

be made by the trier of fact. *Id*.

Defendants concede that MacEllven and Harris were at all relevant times acting under color

of law, but contend that Washington County cannot be held liable for their actions under a theory of

*respondeat superior*. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).

A plaintiff may impose § 1983 liability against a municipality in one of three ways: "(1) by

showing a longstanding practice or custom which constitutes the standard operating procedure of the

local government entity; (2) by showing that the decision-making official was, as a matter of state

law, a final policymaking authority whose edicts or acts may fairly be said to represent official

policy in the area of decision; or (3) by showing that an official with final policymaking authority

either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of

Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (citation and internal quotation marks omitted).  An

unconstitutional policy or custom need not be carried out by the municipality's official lawmakers to

subject the municipality to liability.  Liability may lie against a municipality for conduct by those

"whose acts or edicts may fairly be said to represent official policy." *Pembaur v. City of Cincinnati*,

475 U.S. 469, 480 (1986) (quoting *Monell*, 436 U.S. at 694).  However, municipal liability only

attaches where "a deliberate choice to follow a course of action is made from among various

alternatives by the official or officials responsible for establishing final policy with respect to the

subject matter in question. *Id*. at 484.

As the supervising CVSO for Washington County, MacEllven was acting as a final

policymaker in the area of veterans services.  MacEllven held a management position within the

county and was delegated authority to establish practices and procedures for the provision of

veterans' services.  Pl.'s Facts ¶¶ 14, 16.  *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989) (holding that the "trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue").  The record reflects that MacEllven, as a matter of state law, was operating in a management position with almost no direct oversight in the area of veterans services, and that his decisions with respect to the alleged discriminatory actions and practices were final.  MacEllven made deliberate decisions, discussed below, intended to result in the removal of plaintiff as a C&P examiner that went beyond his statutory duties as a CVSO.  Plaintiff has also demonstrated that MacEllven's managing supervisor delegated authority to MacEllven to manage the provision of veterans services and acted with deliberate indifference to defendants' discriminatory actions.  Pl.'s Facts ¶¶ 25-28. Accordingly, defendants' *Monell* argument is rejected.

Plaintiff, an Asian woman, has established a *prima facie* case of intentional discrimination against defendants.  She has adduced evidence demonstrating that: she was performing her job capably and according to her employer's legitimate expectations; defendants nevertheless sought to have her removed from her position as a C&P examiner; other non-Asian and male examiners were not similarly targeted; and the racial tone of defendants' complaints about plaintiff, and the racist and sexist behavior of Washington County VSOs, establish a genuine issue of fact regarding defendants' motivations.  Plaintiff has shown that an independent audit of her examinations demonstrated that they were accurate, VA personnel were happy with her examinations, and that defendants sought to have her fired by making racially-based complaints, encouraging veterans to ask for non-Asian or male examiners, conspiring with other VSOs to have plaintiff fired, and by

8 - OPINION AND ORDER

encouraging their clients to record their impressions of plaintiff. These actions were not taken with respect to other examiners.

However, defendants have also met their burden of production by articulating a legitimate, non-discriminatory reason for the adverse actions taken. There is evidence indicating that defendants were attempting to have plaintiff removed as a C&P examiner not because plaintiff is an Asian female, but because defendants were attempting to maximize the benefits received by their client veterans. Additionally, there is evidence suggesting that some of the complaints made by defendants regarding plaintiff originated with upset veterans. The fact that plaintiff is Asian, and made some Asian-theater veterans uncomfortable during examinations, may have contributed to defendants' perception that she was not producing accurate examination reports.

Defendants' reporting of complaints made by veterans about plaintiff, and their attempts to maximize their clients' benefits, does not create § 1983 liability. Asian-theater veterans are entitled to request non-Asian examiners and to make complaints about examiners. Defendants are similarly entitled to report these veterans' concerns without liability attaching. However, the record suggests that defendants also actively sought to undermine plaintiff's contract by making complaints themselves, and by encouraging veterans to make complaints, request different examiners, and record their impressions of plaintiff. The racial and sexist tone of the complaints and actions taken by defendants present a credible challenge to defendants' legitimate articulated reasons. Accordingly, a question of material fact exists regarding defendants' motivations.

Defendants also argue that their actions were not a moving force in the PVAMC's decision not to renew plaintiff's contract and that there are no provable damages given the fact that plaintiff did not have a property interest in a renewed contract. However, there is a question of material fact

regarding whether defendants' actions were a moving force in the non-renewal of plaintiff's contract. That question, along with the appropriate measure of possible damages, can be best resolved by a trier of fact.

### Section 1981 Claim

Plaintiff's § 1981 claim requires that she prove essentially the same elements as her § 1983 claim, but with a focus on her right to be free from racial discrimination in the making of contracts. As discussed above, plaintiff has carried her burden by creating a question of material fact regarding whether she was intentionally discriminated against on the basis of her Asian ancestry, and by demonstrating that the discrimination interfered with her ability to contract with the PVAMC. Plaintiff may proceed with her § 1981 claim.

### Section 1985 Claim

Plaintiff's § 1985 claim requires that she prove four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of the equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992) (citation omitted).

For the purposes of defendants' motion, the only difference of any import between plaintiff's § 1985 and § 1983 claims is the conspiracy element. To prove a conspiracy between defendants, plaintiff must "offer evidence of an agreement or 'meeting of the minds' to violate her constitutional rights" to equal protection. *Nunley v. City of Los Angeles*, 121 F.3d 716, No. 95-56090, 1997 WL 429183, *2 (9th Cir. July 31, 1997) (citing *Ward v. Equal Employment Opportunity Comm'n*, 719

F.2d 311, 314 (9th Cir. 1983)).  "A conspiracy may be inferred from conduct and need not be proved by evidence of an express agreement." *Id.*

Plaintiff has offered evidence from which a reasonable jury could infer that defendants conspired to have plaintiff fired in violation of her right to be free from racial discrimination. Namely, Johnson sent an email to all VSOs in his directory requesting complaints about plaintiff, stating that he wanted her removed as an examiner.  Pl.'s Facts ¶ 26.  Thereafter, VSOs including MacEllven and Harris discussed having plaintiff removed as a C&P examiner and encouraged veterans to record their impressions of plaintiff.  *Id.*  Given the racial tone of some complaints about plaintiff, and racist behavior tolerated by Washington County, a question of fact exists as to whether defendants conspired to deprive her of equal protection on account of her race.

**Qualified Immunity**

Defendants contend that MacEllven and Harris are entitled to qualified immunity for their actions.  Qualified immunity protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 US 800, 818 (1982).  Defendants are entitled to qualified immunity where they "reasonably could have believed that their conduct was lawful 'in light of clearly established law and the information that they possessed.'" *Cohen v. San Bernardino Valley College*, 92 F.3d 968, 973 (9th Cir. 1996) (quoting *Baker v. Racansky*, 887 F.2d 183, 187 (9th Cir. 1989)).  When analyzing an assertion of qualified immunity, the court must look at the particular facts of the case and the particular rights invoked.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  If the contours of the right are not sufficiently clear, the officials are entitled to qualified immunity.  *Id.*  However, an official action is not protected by qualified immunity simply

because "the very action in question" has not previously been held unlawful. *Id.* (citations omitted).

Defendants contend that "no jurisdiction has recognized a right for plaintiff to be free of interference from members within an organization who expose wrongdoing or who forward relevant information along proper channels to appropriate third parties." Defs.' Br. 13. While this assertion is accurate, this court must analyze the facts in a light favorable to plaintiff. In that light, defendants did not merely report veterans' complaints, but actively discriminated against plaintiff and conspired to have her removed from her job as a C&P examiner on account of her race. "Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a [government] must not discriminate against a person because of his race." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 151-152 (1970). A reasonable person would understand that attempting to get somebody fired on account of her race is unlawful. Defendants' request for qualified immunity is rejected.

**Defamation**

In order to establish a claim for defamation, plaintiff must show that defendants harmed her by making a defamatory statement concerning plaintiff to a third party. *Wallulis v. Dymowski*, 918 P.2d 755, 758 (Or. 1996). A statement is defamatory "if it tends to harm the reputation of another as to lower him the estimation of the community or to deter third persons from associating or dealing with him." *Walleri v. Federal Home Loan Bank of Seattle*, 83 F.3d 1575, 1583 (9th Cir. 1996).

Because the assessment of a defamation claim is a statement-specific inquiry, it is important to identify which statements are alleged to have defamed plaintiff. *Morlan v. Qwest Dex, Inc.*, 332 F.Supp.2d 1346, 1360 (D.Or. 2004). This court construes plaintiff's allegations as asserting that Washington County VSOs spoke disparagingly about Asians and women, denounced plaintiff's character, and exaggerated the number of veterans who made complaints about plaintiff. Plaintiff

cites statements made in two specific letters sent to the PVAMC and the alleged statements made by

MacEllven encouraging his veterans to record their impressions of plaintiff.  This court limits its

review to those statements.  While defendants are alleged to have made other comments to PVAMC,

none of those comments is set forth with sufficient specificity to evaluate.

   The first letter is the one that Harris wrote, and MacEllven sent, to Dr. Tuchschmidt.  In the

letter, Harris wrote that:

> When Dr. Ee first started working for the Administration I would frequently have
> veterans return from their exam who were very upset at the experience.  In my
> opinion and what I have heard some of my clients say it is a slap in the face to have a
> woman with no military or combat experience of Asian descent conduct interviews
> for PTSD.  I do not feel that the Veterans who see Dr. Ee are able to open up and get
> a fair examination . . . Appointing an Asian woman with no basic military
> understanding is an unfair situation to place a Veteran into.

Ostar Decl. Ex. 10.

   The second letter from MacEllven was sent to the PVAMC.  In the letter, MacEllven

requested that they disregard an examination conducted by plaintiff because he felt the examination

report was inconsistent with the veteran's medical history.  Second Ostar Decl. Ex. 1.  MacEllven

stated that the veteran in question "was very upset about the manner in which Dr. Ee conducted the

interview.  He found her to be very abrupt."  *Id.*  MacEllven also allegedly made statements to

veterans regarding the quality of plaintiff's examinations and encouraged them to record their

impressions of her.

   Assuming without deciding that these statements were defamatory, this court finds that

plaintiff's defamation claim fails because the communications were privileged.  Under Oregon law, a

statement is conditionally privileged if: "(1) it was made to protect the interests of defendants; (2) it

was made to protect the interests of plaintiff's employer; or (3) it was on a subject of mutual concern

13 - OPINION AND ORDER

to defendants and the persons to whom the statement was made." *Wattenburg v. United Med. Labs., Inc.*, 525 P.2d 113 (Or. 1974). It is clear that the statements at issue fall within all three protected subject matters.

When statements are conditionally privileged, a plaintiff can pierce the privilege by proving the privilege was abused. *Wallulis*, 918 P.d at 761. Plaintiff has failed to allege the privilege was abused and has not satisfied this burden. However, even if plaintiff had so argued, the statements would continue to be conditionally privileged because "there can be no abuse of a conditional privilege when the speaker 'republishes a defamatory statement . . . under circumstances that make it clear that it is an allegation, not a fact, that is being repeated.'" *Morlan*, 332 F. Supp. 2d at 1362; (quoting *Vanderselt v. Pope*, 963 P.2d 130, 136 (Or. Ct. App. 1998)). Even taken in the light most favorable to plaintiff, defendants were merely republishing allegations made by client veterans. Accordingly, plaintiff's defamation claim is dismissed.

**Intentional Interference with Business Relations**

Plaintiff argues that defendants intentionally interfered with plaintiff's contractual relationship with the PVAMC. Plaintiff alleges that defendants were acting within the scope of their employment and were at least partially motivated by a desire to maximize their clients' benefits. Pl.'s Br. 4-5. These allegations defeat plaintiff's interference claim. "Employees are immune from liability for intentional interference with a contractual relationship provided that the employee is (1) acting within the scope of his employment and (2) acting with at least partial intent to benefit the employer." *Blackthorne v. Posner*, 883 F. Supp. 1443, 1456 (D.Or. 1995) (citing *Welch v. Bancorp Mgmt. Advisors*, 675 P.2d 172, 177 (Or. 1983), *modified on other grounds*, 679 P.2d 866 (Or. 1984)). Accordingly, plaintiff's intentional interference with business relations claim is dismissed.

**CONCLUSION**

For the foregoing reasons, defendants' Motion for Summary Judgment [86] is DENIED IN

PART and GRANTED IN PART.  Columbia County is DISMISSED as a party from this action, and

plaintiff's state law claims against defendants MacEllven, Harris, and Washington County are

DISMISSED.  Plaintiff may proceed with her claims brought pursuant to 42 U.S.C. §§ 1981, 1983,

and 1985.

IT IS SO ORDERED.

DATED this  25  day of February, 2010.

                    /s/ Ancer L. Haggerty
                   Ancer L. Haggerty
                   United States District Judge